---

## THE N. AND W. NO. 2.

### (District Court, E. D. New York. June 2, 1900.)

1. TUG AND TOW—GROUNDING OF TOW—FAULT.

A tug with two heavily laden tows on a line, the whole extending 2,400 feet in length, was passing through a channel near the northern limit, which curved so as to require the tug to keep continually changing her course to the southward. There was sufficient room to pass through in safety, but the first tow, which was a schooner converted into a coal barge and in charge of a master, failed to follow closely the changing course of the tug, and got beyond the limits of the channel, grounding in the shallow water. *Held*, that the tug was in fault because of the failure of the master to keep watch to see that the tows were following so as to keep inside the channel, and that the master of the tow was also in fault for not using the helm, as he might have done, to keep her in the course of the tug, and within the line of buoys which marked the channel.

2. SAME—PROXIMATE CAUSE OF LOSS OF TOW.

The tug having afterwards made an attempt to rescue the tow, which was unsuccessful owing to a severe storm, because of which the failure could not be attributed to the fault of either vessel, the original grounding must be regarded as the proximate cause of the subsequent loss of the tow and cargo in such storm, and the damages divided accordingly.

In Admiralty. Suit against a tug to recover for the loss of her tow.

Robinson, Biddle & Ward, for libelant.

Butler, Notman, Joline & Mynderse, for claimant.

THOMAS, District Judge. This action is for the loss of the barge Crockett and her cargo from grounding by the alleged negligence of the tug which had her in tow. On February 11, 1899, at 11 a. m., the steam tug N. and W. No. 2 arrived off Sandy Hook. She had in tow the David Crockett, converted from a ship into a barge, and after her was the barge N. and W. No. 4, both laden with coal. The Crockett was 218.8 feet in length, 41 feet in breadth, and 27 in depth, and drew 24 feet, while the barge N. and W. No. 2 drew 19 feet of water. The hawser between the Crockett and the tug was 200 fathoms in length, and that between the Crockett and N. and W. No. 4 was 175 fathoms in length. The day immediately preceded the several days of severe storm of February, 1898, and the captain of the tug apprehended difficulty on account of the ice which was coming out on the ebb tide. Therefore, he turned back to sea, and, circling the lightship, came back again to the entrance of Gedney's Channel, at about half after 2 o'clock, when the strength of the ebb tide was spent, the wind light from the northwest, and the weather clear. The northern limit of the channel is indicated by a series of buoys, and the tug N. and W. No. 2 followed the course of such buoys, at a distance of 300 or 400 feet therefrom, until the

Crockett suddenly brought up aground; whereupon the barge N. and W. No. 4 continued her forward movement past the port side of the Crockett, and thereafter sagged down, under the influence of the wind and tide, upon the schooner Helen, at anchor in the main channel. Inasmuch as the channel at this point is at least 3,000 feet wide, the tug is accused of negligence in selecting a course so near its northern limit, while there was ample space to the southward. Indeed, shortly preceding the N. and W. No. 2, and within her sight, were the tug Ice King, with a coal laden barge in tow, and the tug N. and W. No. 1, towing two large, coal-laden barges, who safely passed south of the schooner. The reason assigned by the master of the tug for failure to pursue this same course was that the schooner Helen had been seen by him, apparently drifting southerly across the channel, and that he feared to go south of the Helen, lest the latter might continue her drifting, and come in contact with some portion of the tow. It is undoubted that there was more space and ampler opportunity to pass to the southward of the schooner; but the schooner had been drifting, and the master of the tug N. and W. No. 1 passed southerly of the schooner, and stated that, from knowledge derived during such passage, he would, if in command of No. 2, have tried to go to the northward. There is other evidence justifying the conclusion that the mere selection of the passage north of the schooner was not negligent in itself, and that there was reasonable opportunity for a competent navigator to make the passage. The question follows, why did the Crockett ground? The course of the tug and tow, and the places of the various happenings, are illustrated by the sketch included herein:

A—B. Course of tug and tow to entrance to Gedney's Channel.
B—C. Course of tug and tow through Gedney's Channel.
C—F. Course of tug and tow when entering main channel.
O—D. Course of tug and tow projected when Crockett grounded.
M.    Place where Crockett grounded, as claimant states.

The tug was steered so as to make a course parallel with the buoys, and the above delineation was made by the master of the tug at the time of trial. In the main channel that course is given as W. by S., but on account of the set of the tide the heading of the tug was W. ½ N. But the precise headings need not be determined accurately. The tug was near the north line of the channel, and the important consideration is that the tug was from time to time changing her course.

From the foregoing statements it appears that the conditions were these: A powerful tug, with a tow 2,400 feet in length, proceeding westward on a clear day, encountered a channel 3,000 feet wide, whose waters were disturbed only by the last of the ebb tide, setting southeasterly, and by a light wind from the northwest. The only obstacle to the passage was a schooner at anchor, which had drifted across the northern limit of the channel, but was now stationary, although the master of the tug apprehended that it was still drifting. But the master states that there was quite room enough to go to the northward of it, and there was certainly space enough to the southward; hence there were no impediments to a safe passage. Yet with all this opportunity the Crockett brought up on a shoal beyond the northern boundary of the channel. The grounding of her tow, under circumstances so fair, would seem to suggest negligence on the part of the master of the tug, in the absence of accusatory acts or omissions on the part of the master of the Crockett, for the fault must lay with one or both of these officers. The tug, following a practice which is somewhat customary, makes accusation that the barge sheered to the starboard, and went 400 feet out of her course. It seems improbable at the outstart that the Crockett, compelled forward along the course of, and by, a powerful tug, and steadied aft by a large, heavily-laden barge, deflected to the northward along the line of greatest resistance, against the combined adverse forces of tide and wind. unless (1) the master of the Crockett, by accident or design, steered her out of her course, of which there is no evidence: or (2) the Crockett did not follow the tug as she gradually turned to the southward. It appears that either the tug drew the Crockett upon or too near the shoal place, not making sufficient allowance for her turning, or the master of the Crockett failed to steer her after the tug, or both these faults existed. It is not believed that the Crockett "sheered," according to the usual meaning of the term, although she would appear to sheer if she was not kept behind the tug. The fact seems to be that the Crockett did not follow the tug, as the evidence tends strongly to show that she was on her starboard side at the time of the accident. But why did the Crockett, when she was grounded, bear on the starboard quarter of the tug? At this time the tug had changed her course to the southward, and it is apprehended that she may not have made due allowance for the Crockett, which was 1,200 feet behind, and which would not continue upon a correct course unless duly and sufficiently influenced by the swinging tug, or by her own helm, or by both. But the master of the Crockett seems not to have starboarded his wheel, although he must have seen, or at least he should have seen, the necessity of directing his course so as to follow the tug, which was obliged to

change, from time to time, to follow the line of buoys. The very fact that the tow was of such length, and that it was in such proximity to the northerly shore, imposed upon the tug the observance of increased care, and if the passage seemed perilous, as the libelant now claims, the master of the Crockett himself was bound to use some special prudence in the performance of his well-defined duty of keeping the Crockett in the wake of the tug. Nothing but the momentum given to the Crockett carried her forward, and she would not have gone sufficiently forward to strike, if the course upon which she had been placed had not been near—it need not be adjudged dangerously near—the shoal places; and she would have been deflected from, or would not have continued upon, her final course, had the master of the tug kept the Crockett under observation and made proper allowance for her turning, or had the master of the Crockett been alive, as he seemed not to be, to the fact that his vessel was not following, and had starboarded with reference to that condition. It will be observed that the master of the Crockett states that his vessel did not sheer,—did not deviate from an accurate traction after the tug,—and hence he took no measures in steering which would be suitable in such event. It seems fairly inferable that the Crockett was for this reason in fault, and, considering the circumstances, the tug should not be exculpated. The master of the tug was aware that he was near the northern limit of the channel. He knew that his tow, nearly equal in length to the entire width of the channel, and upon his own estimate nearly 3½ times longer than the space between the schooner and the limit of the northern channel, was to be carried between such schooner and such limit, and yet his view of his boat was obscured by the back of the pilot house, which was without windows. His crew was forward, no person was on the stern of the tug to watch whether the tow was following, and this continued so long that the Crockett went off the desired course 400 feet, and grounded, before her aberration was discovered by the master of the tug. In making his way it was necessary for such master to calculate both for his tug and tow; to observe, or to be advised, whether his calculations were sufficient and effective. But he did nothing to verify the safety of his course, and left the tow to go where it might be carried. The fact was that it was carried too far northward; it did not follow the tug with sufficient quickness for safety. So, little by little, the Crockett went off until she was outside of the proper channel. Now, the master of the tug should have made better allowance of space for the Crockett to come around, and he should have kept watch himself, or he should have placed another on watch, for the purpose of seeing how the provision he had made was availing. He did neither. To this he would answer that he was privileged to rely upon the master of the Crockett for the proper traction of the vessel. Indeed, that person did have a duty in that regard; but it is considered that the schooner was quite too near the northern limit of the channel, and the tow was quite too long and cumbersome, to permit the sole responsibility of its correct following to be laid upon the masters of the vessels in tow. It was the duty of the master of the tug to be vigilant in observing where his tow was. He was not permitted to look forward alone. His

task was to take along the tow, and he should have been watching, or have placed another to watch, how he was effecting the result.

But the Crockett was not lost at this time. She grounded, and the libelant claims that she never substantially changed her position until she went to pieces, in consequence of the storm that followed for several days. If so, the influences already considered were the proximate cause of the disaster, and the libelant may not claim further fault on the part of the tug. But the claimant's witnesses show that the Crockett drifted further northward, and about a mile from the first place of grounding, and that the tug, on the second day of the accident, in a blinding snowstorm, pulled her off and towed her to the main channel, and that thereupon the Crockett violently crossed from the port side of the tug, taking a sheer to the northward, drawing the tug after her, and finally brought up near Flynn's Knoll, north of buoy No. 6. The tug's statement seems to be more credible, for it is quite improbable that the tug's witnesses could have imagined that they towed the Crockett a mile, and into the main channel, unless there was something of truth behind the statement. They were the active agents; the master of the Crockett was passive, and unconscious of the event and the arduous labors of those on the tug. The storm was raging, and little could be seen, and what was done or left undone seems to add or detract nothing from the credit or discredit of either party, as it theretofore existed. The first grounding, considering the tempestuous weather in which the rescue was undertaken, should be regarded as the proximate cause of the Crockett's loss. The conclusion that the master of the tug was negligent, if not in permitting the barge to go too near the northerly limit of the channel, yet at least in failing to make any observation of his tow, and that the master of the barge contributed to the grounding by failing to observe the position of his vessel, and to put his wheel to starboard to correct a deviation that should have been apparent, must lead to a division of the damages, with costs.